## McNEILL v. RAILROAD CO.

(Filed June 1, 1904).

1. CARRIERS—*Passes—Contracts.*

The conditions endorsed on the back of a pass that has expired or that is illegally issued have no legal effect whatever, even if otherwise valid.

2. CARRIERS—*Passengers—Contracts.*

The rights, privileges and protection attaching to the relation of a passenger are imposed by law upon common carriers upon considerations of public policy, independent of contract, and arise from the nature of their public employment.

3. CARRIERS—*Passengers—Acts 1891, ch. 320, sec. 4.*

A gratuitous passenger is not *in pari delicto* with the common carrier under sec. 4, ch. 320, acts 1891.

PETITION to rehear this case, reported in 132 N. C., 510.

*W. J. Adams, U. L. Spence, J. D. McIver, Douglas & Simms* and *Shepherd & Shepherd,* for the petitioner.

*Guthrie & Guthrie, Muchison & Johnson* and *F. H. Seawell,* for the defendant.

DOUGLAS, J. This is a rehearing of the case originally decided in 132 N. C., 510, 95 Am. St. Rep., 641. We fully concur in our former opinion as to the illegality of the contract by which the defendant agreed to give to the plaintiff free personal transportation to an unlimited extent in consideration of certain advertising. The only ground on which we allow the petition is that the plea *in pari delicto,* applying solely to the contract of carriage, is not a defense to an action for personal injuries caused by the negligence of the defendant.

The plaintiff testified as follows: "Marshburn called on me for my ticket. I told him I had a pass for 1899, and showed it to him, and told him I would pay the regular fare if he wanted it. He said it was all right. I was the editor of the *Carthage Blade,* a newspaper published at Carthage. In 1889 I made a contract with the defendant to publish its time-table in my paper as the consideration for the pass. I

did publish the time-table, and the defendant agreed to contract and renew the pass for 1900. The contract was not in writing."

The superintendent of the defendant company testified that there was no such contract, but that the pass was a gratuity. This raised a question of credibility which, in the view we take of the case, becomes of no practical importance. In any event, it would be a question of fact for the jury. The contract for transportation was rendered absolutely void by the statute, founded upon public policy, whether based upon no consideration or upon the inadequate consideration of printing a time-table. The pass issued in pursuance of an alleged contract, and for the purpose of carrying out its unlawful purpose, inherits its invalidity. The defendant was free at all times to decline to carry the plaintiff except upon the payment of the usual fare, and to eject him from its train upon his refusal to pay. The fact that the pass had expired makes no difference, as in its character as a contract it never had any legal existence. Being without legal existence, it was equally void of legal effect; and conferring no rights upon the plaintiff, imposed upon him no obligations which the law will enforce. A void contract is thus defined in Lawson on Contracts, section 350: "A void contract is one destitute of legal effect. It is a mere nullity and good for no purpose whatever. It is binding upon neither party and may be attacked as invalid by strangers. It does not require any disaffirmance to avoid it, but may be simply disregarded and it cannot be ratified and made valid."

The pass itself being worthless, the conditions on the back thereof could have no application. They were not independent contracts, and if they had been, were totally wanting in a legal consideration. Therefore this case does not come within the principle laid down in *Railroad v. Adams*, 192 U. S., 440, where the pass was recognized as a lawful and valid con-

tract for free transportation. By citing and distinguishing that case, decided by a divided court, we do not mean to express our approval of its argument or conclusion. It is not necessary for us to consider it in the case now before us.

We may here repeat that it is not the unlawful contract for free transportation which renders a railroad company liable to the penalty, but it is the transportation itself. In the view of this statute a free pass is a mere incident, as the same result could be obtained by issuing a thousand-mile ticket or one in ordinary form. The offense consists in the free carriage of a passenger, whether with or without a pass or ticket; and the offense is complete when such passenger is carried any appreciable distance. The railroad company may have issued to him a free pass or ticket from Raleigh to New York with impunity, but would become liable to the full penalties prescribed by the statute as soon as it had transported such passenger to the first station out of Raleigh. In using the term "free transportation," we mean to include all transportation which justly comes within the forbidden principle of discrimination. A mere colorable consideration will neither evade the penalties of the statute upon the one hand nor confer any rights upon the other.

We must bear in mind that while the statute renders absolutely void any contract for free transportation, so that neither party thereto can acquire any rights thereunder, it imposes the penalty only upon the transportation company. The act of free transportation alone is criminal. The party accepting such transportation is not guilty of a criminal act, whatever moral blame may attach to the reception of unlawful favors. Therefore, in contemplation of law, the parties cannot be considered *in pari delicto*. This difference is well expressed by *Pearson, J.,* speaking for the Court in *Melvin v. Easley,* 52 N. C., 356. That was an action for deceit and false warranty in the sale of a horse on Sunday by a horse-

trader, in violation of Rev. Statutes, chapter 118, section 1. The Court says, on page 358: "It is said that the plaintiff knew the defendant was a horse-trader and concurred in his violation of the statute, and, consequently, was *particeps criminis.* Does this consequence follow? In crimes, there are accessories; in misdemeanors, all who aid or concur are held to be equally guilty, and are subject to like punishment with the party who commits the offense. This plaintiff is not guilty of violating the law, and is not subject to a penalty, so he cannot be *particeps criminis* in the legal sense of the terms. He is not *in pari delicto,* and it is against the policy of the law and will defeat its object so to consider him. The Court will not aid any person who violates the law; therefore, the defendant could not maintain an action. This rule is adopted on the ground of policy, for the purpose of preventing a violation of the law, and if confined in its operation to the actual offender its application will be salutary, but if it be extended to the party who is not an offender, so far from checking it will encourage a violation of it by letting it be known to 'horse-traders,' 'shop-keepers' and 'all whom it may concern,' that they may cheat with impunity, provided always, it may be done on the Lord's Day."

The plaintiff was lawfully upon the defendant's train, and testifies that he offered to pay his fare if required by the conductor. The conductor permitted him to ride free, not as a personal favor to him, but in furtherance of a contract between him and the company itself acting through its superior officers. There is no suggestion that the plaintiff was seeking to defraud the company in any manner or that there was any collusion between him and the conductor. He was in every respect a *bona fide* passenger, and entitled to all the protection incident thereto unless deprived thereof by the acceptance of free transportation.

The cases relied on to sustain the defense of *in pari delicto*

McNeill *v.* Railroad Co.

are chiefly of two classes, those involving a violation of the Sunday laws, and those growing out of the relation of the plaintiffs towards the national government during the Civil War. The latter class, evoked from conditions now happily passed away forever, furnishes no criterion for the determination of the case at bar. It is enough to say that in both classes of cases the plaintiffs were actually engaged in the performance of an act expressly denounced as criminal by the law of the land as construed by the courts in which the actions were necessarily brought. Following are illustrative cases: *Turner v. Railroad,* 63 N. C., 522; *Martin v. Wallace,* 40 Ga., 52; *Wallace v. Cannon,* 38 Ga., 199, 95 Am. Dec., 385; *Railroad v. Redd,* 54 Ga., 33; *Connolly v. Boston,* 117 Mass., 64, 19 Am. Rep., 396; *Smith v. Railroad,* 120 Mass., 491, 21 Am. Rep., 538; *Lyons v. Desotello,* 124 Mass., 387; *Holcomb v. Danby,* 51 Vt., 428.

While entertaining the highest respect for the Lord's Day, the Sunday of the new law, we have not deemed it our duty to enforce its observance, so as to make it the shield of wrong. *Rodman v. Robinson,* at this term.

In the case at bar the plaintiff is certainly neither a tramp nor a trespasser, as both those terms imply an unlawful presence against the will of the owner. Hence it is needless to examine the cases dealing with such relations.

If the plaintiff's evidence be true, he was not a gratuitous passenger in the full sense of the term, inasmuch as he printed in his paper the schedule of trains in consideration of his otherwise free carriage. This was an inadequate consideration which rendered the contract void as an unlawful discrimination, but it was none the less a consideration of some actual value. But while this might, as between the plaintiff and the defendant, bring the case within the principle of *Railroad v. Lockwood,* 17 Wall., 357, we deem it

proper to treat the plaintiff as a gratuitous passenger, in view of the unlawful consideration, and will cite the able opinion in that celebrated case only in so far as it relates to this view of the case at bar.

It is often said that one becomes a passenger by virtue of a contract. This is not always so. A contract is a voluntary agreement between two parties, a coming together of two minds to a common intent, and yet a passenger may become such without a contract and indeed against the will of the carrier. A common carrier has no right to refuse a passenger without sufficient reasons, and such reasons so rarely occur and are so exceptional in their nature as to vary the general rule too slightly for practical consideration. Suppose the carrier without legal excuse should refuse to sell a ticket to one having the *bona fide* intention of becoming a passenger, and that the passenger should then enter the carrier's train in an orderly manner, take his seat in the proper car and tender his fare to the conductor, would the refusal of such fare deprive him of his legal status as a passenger? Assuredly not. He would be a passenger in the fullest meaning of the term, entitled to all the rights, privileges and protection attaching to that relation; and yet there would be no actual contract between him and the carrier. But it may be said that the law raises an implied contract. Even if we accept that form of expression, it simply means that the law imposes upon a common carrier certain duties and liabilities which adhere to the nature of his calling. We prefer to adopt the more direct expression, and say that those duties and liabilities are imposed by law upon common carriers upon considerations of public policy independent of contract and arise from the nature of their public employment. Contracts may be made with the carrier, but into all such contracts certain conditions are written by the hand of the law. One such condition is the inherent liability of the carrier for all

injuries proximately resulting from its own negligence or that of its servants.

But as we have already said, in the case at bar there was no legally existing contract, which is equivalent to saying there was no contract at all.

Viewing the plaintiff as a gratuitous passenger, and it appearing from the verdict that he was injured through the negligence of the defendant, we think. that he is entitled to recover.

We have given this case most careful consideration, and have examined a very large number of authorities, but will cite those only which directly bear upon the case in the view we take of it, omitting needless repetitions from the same State. Neither time nor space will permit the discussion of cases having no essential relation to that at bar.

It is significant that the greater weight of authority is to the effect that a passenger may recover for injuries received from the negligence of a common carrier or its servants even when unlawfully traveling on Sunday or on a lawful pass with conditions endorsed thereon releasing the carrier from all liability. In both cases the cause of action is attributed to injuries resulting from the breach of a public duty. *A fortiori*, the plaintiff can recover for such negligence when the defendant alone is in the commission of an unlawful act and when there is no release of liability.

We will begin our citations from the Supreme Court of Pennsylvania, a Court which is not addicted to emotional jurisprudence, and has never shown any disposition to burden railroad management with unnecessary conditions or restrictions. In *Railroad v. Butler,* 57 Pa. St., 335, the intestate was killed while riding on a free pass on which a release was endorsed. *Sharswood, J.,* speaking for the Court says, on page 337: "The first error assigned has been properly abandoned, as it is too well settled to be now controverted

that a stipulation by a common carrier that he shall not be liable for damages does not relieve him from responsibility for actual negligence by himself or servants." This case is cited with approval upon the same point in *Burnett v. Railroad,* 176 Pa. St., 45, the latest case upon the subject.

In *Carroll v. Railroad,* 58 N. Y., 126, 17 Am. Rep., 221, where the plaintiff was traveling on Sunday contrary to the statute, it was held that: "The duty imposed by law upon the carrier of passengers to carry them safely, as far as human skill and foresight can go, exists independently of contract. For a negligent injury to a passenger an action lies against the carrier, although there be no contract, and the service he is rendering is gratuitous; and whether the action is brought upon contract or failure to perform the duty the liability is the same. One violating the statute prohibiting travel upon Sunday (1 R. S., 628, section 70), is not without the protection of the law. The carrier owes to him the same duty as if he were lawfully traveling, and is responsible for a failure to perform it the same in the one case as in the other."

The Court says, pages 133, 154: "But we deem it unnecessary to decide the question, which was argued with great ability by counsel, touching the liability of the defendant in the action, treating it as founded upon the contract between the parties. The gravamen of the action is the breach of the duty imposed by law upon the carrier of passengers to carry safely, so far as human skill and foresight can go, the persons it undertakes to carry. This duty exists independently of contract, and although there is no contract in a legal sense between the parties. Whether there is a contract to carry, or the service undertaken is gratuitous, an action on the case lies against the carrier for a negligent injury to a passenger. The law raises the duty out of regard for human life, and for the purpose of securing the utmost vigilance by carriers

135——44

in protecting those who have committed themselves to their hands. The liability of the carrier is the same whether the action is brought upon contract or upon the duty, and the evidence requisite to sustain the action in either form is substantially the same, and when there is an actual contract to carry it is properly said that the liability in an action founded upon the public duty is co-extensive with the liability of the contract. This case, therefore, is not within the principle of many of the cases cited, which forbid a recovery upon a contract made in respect to a matter prohibited by law, or for a cause of action which requires the proof of an illegal contract to support it."

In *Railroad v. Trautwein*, 52 N. J. L., 169, 7 L. R. A., 435, 19 Am. St. Rep., 442, it was held that the plaintiff could recover although unlawfully traveling on Sunday, the Court saying, on pages 171, 172: "A contract to carry made on Sunday, or to be performed on Sunday, is, by force of the statute, illegal and void. No action could be maintained for the breach of such a contract, nor for services performed under it, where the right of action rests exclusively upon a contract, express or implied. It is also clear that a plaintiff will fail where, to make a cause of action, he is compelled to rely upon an illegal contract. But the duty of persons engaged in these public employments to safely carry is independent of contract. It is a duty imposed by law from considerations of public policy, and arises from the fact that persons or property are received in the course of the business of such employments. Nor was the plaintiff's violation of the Sunday law, in a legal sense, the cause of her injury. It was only the occasion for an injury by the defendant's wrongful act, and hence her wrong-doing did not contribute to the injury in such a sense as to deprive her of her right of action; it was merely a condition and not a contributory cause of the injury."

In *State, use of Abell, v. Railroad,* 63 Md., 433, it was held that: "When a carrier undertakes without any special contract to carry a passenger gratuitously, the passenger is entitled to the same degree of care as if he had paid his fare." The Court says, on page 443: "The principle announced in this decision, that the duty of the carrier to convey safely, does not result from the consideration paid, but is imposed by law, has been recognized by this Court on the motion to re-argue the case of *Baltimore City Pass. Ry. Co. v. Kemp and Wife,* 61 Md., 619, 480 Am. Rep., 134, where the Court says that a common carrier who accepts a party to be carried owes to that party a duty to be careful irrespective of contract, and this Court illustrates the principle by the example of a child for whom no fare is charged but who would recover in case of injury the result of negligence."

In *Lemon v. Chanslor,* 68 Mo., 340, 30 Am. Rep., 799, a gratuitous passenger injured by the breaking down of a hack was allowed to recover. The Court says, on page 357: "This, we think, was sufficient to authorize the instruction. The principle announced in it, that although plaintiff might have been a gratuitous passenger such fact constituted no defense, is supported by all the authorities which have come under our observation. While in some of them intimations are made that in the case of a gratuitous passenger the carrier may only be liable for gross negligence, it has not been held in any of them that such fact would exempt the carrier from all liability. On the contrary, the weight of authority favors the doctrine of holding the carrier of passengers to the same degree of diligence in all cases where one has been received as a passenger, on the principle that if "a man undertakes to do a thing to the best of his skill, when his situation or profession is such as to imply skill, an omission of that skill is imputable to him as gross negligence."

In *Jacobus v. Railway,* 20 Minn., 125, 18 Am. Rep., 360,

it was held that the plaintiff could recover although riding on a pass, as the same degree of care was required of the common carrier as if the plaintiff had been a passenger carried for hire.    The Court says, on page 129: "In the case at bar, however, the plaintiff was not merely a gratuitous passenger, *i. e.,* a passenger carried without payment of fare or other consideration.    He was a passenger upon a free pass expressly conditioned that the defendant should not be liable to him for any injury of his person while he was using or having the benefit of such pass.    Does this circumstance distinguish his case from that of a merely gratuitous passenger?"    *    *    *    "There are two distinct considerations upon which the stringent rules as to the duty and liability of carriers of passengers rests.    One is a regard for the safety of the passenger on his own account, and the other is a regard for his safety as a citizen of the State.    The latter is a consideration of public policy growing out of the interest which the State or government as *parens patriæ* has in protecting the lives and limbs of its subjects."    *    *    *    "So far as the consideration of public policy is concerned, it cannot be over-ridden by any stipulation of the parties to the contract of passenger carriage, since it is paramount from its very nature.    No stipulation of the parties in disregard of it, or involving its sacrifice in any degree, can, then, be permitted to stand.    Whether the case be one of a passenger for hire (a merely gratuitous passenger) or of a passenger upon a conditioned free pass, as in this instance, the interest of the State in the safety of the citizen is obviously the same. The more stringent the rule as to the duty and liability of the carrier, and the more rigidly it is enforced, the greater will be the care exercised and the more approximately perfect the safety of the passenger.    Any relaxation of the rule as to duty or liability naturally, and, it may be said, inevitably, tends to bring about a corresponding relaxation of care

and diligence upon the part of the carrier. We can conceive of no reason why these propositions are not equally applicable to passengers of either of the kinds above mentioned."

In *Tibby v. Railway Co.,* 82 Mo., 292, the intestate was killed riding on a free pass on top of a cattle car. The plaintiff was allowed to recover, the Court saying, on page 300: "The contract of exemption from damages was properly excluded. A common carrier is not permitted to stipulate against its own negligence (citing cases). This rule, in its application to the carriage of passengers, has never been relaxed."

In *Opsahl v. Judd,* 30 Minn., 126, the plaintiff unlawfully traveling on Sunday was permitted to recover. The Court says, on page 128: "It is further contended that the deceased was, by accepting passage upon the steamboat, engaged in an unlawful act, and was *particeps criminis* with the defendants and their agents in violating the Sunday law. It is a sufficient answer to this objection that the defendants on that day occupied the relation of common carriers of passengers and their general obligation to use such care and diligence as the law enjoins is not limited by the contract with the passengers, nor with the person who engaged the use of the boat and the service of the crew for that day, but is governed by considerations of public policy. That the undertaking was unlawful does not touch the question. *Carroll v. Railroad,* 58 N. Y., 126; *Jacobus v. Railroad,* 20 Minn., 110. As remarked by the Court in that case, "any relaxation in the rule as to duty or liability naturally, and, it may be said, inevitably, tends to bring about a corresponding relaxation of care and diligence upon the part of the carrier."

In *Rose v. Railroad,* 39 Iowa, 246, it was held, quoting the headnote, that: "The payment of fare is not necessary to create the relation of common carrier and passenger. A

railroad company was held to be liable for causing the death of a passenger by the negligence of its employees, notwithstanding he was at the time riding upon a free pass, upon which was a stipulation, signed by himself, releasing the company from all liability for injury to his person or property while using the same." In its opinion the Court adopts the language used in *Railroad Co. v. Derby,* 14 How., 483.

In *Russell v. Railroad,* 157 Ind., 305, 56 L. R. A., 253, 87 Am. St. Rep., 214, the release from liability given by a Pullman porter was held valid on the ground that he was not a passenger; but the Court uses the following language, on page 309: "The decisions of this State firmly establish that a common carrier of goods or passengers cannot contract with a customer for a release of the carrier from liability resulting from the latter's negligence" (citing cases).

The grounds upon which this prohibition rests are variously stated by the Court. It has been said that such exemptions are against public policy; that the public is interested in the exercise of care and diligence on the part of the carrier; that it is unreasonable for any person or corporation to contract for the privilege of being negligent, and that the public is concerned with the life and security of every citizen. The fundamental reason, however, for holding common carriers, such as the appellee, liable for the results of their negligence, notwithstanding contracts exempting them therefrom, is that the State has granted them privileges which they exercise for the benefit of the public; in return for these, the common carrier impliedly undertakes to use due care and diligence in the transportation of both goods and passengers. This being a main inducement for the grant of its special rights, the carrier cannot by any special contract rid itself of the burden of responsibility, which is one of the conditions of its creation. Were it permitted to escape liability by entering into exonerating agree-

McNeill *v.* Railroad Co.

ments, its position of advantage over its patrons would, in almost every instance, enable it to force from them such stipulations as it desired, and the object of the State in creating the carrier would be virtually defeated, the carrier thus being able to abandon the duty imposed upon it by the State. As said in the case of *Railroad v. Faylor,* 126 Ind., 126, at page 130: "A stipulation that the carrier shall not be bound to the exercise of care and diligence is in effect an agreement to absolve him from one of the essential duties of his employment, and it would be subversive of the very object of the law to permit the carrier to exempt himself from liability by a stipulation in his contract with a passenger that the latter should take the risk of the negligence of the carrier or of his servants. The law will not allow the carrier thus to abandon his obligation to the public, and hence all stipulations which amount to a denial or repudiation of duties, which are of the very essence of his employment, will be regarded as unreasonable, contrary to public policy, and therefore void."

In *Railroad v. Curran,* 19 Ohio St., 1, 2 Am. Rep., 362, at page 12, the Court says: "Carriers, of the class of the plaintiff in error, are creatures of legislation and derive all their powers and privileges by grant from the public. They are created to effect public purposes, as well as to subserve their own interest. They are intended by the law of their creation to afford increased facilities to the public for the carriage of persons and property, and, in performing this office, they assume the character of public agents, and impliedly undertake to employ in their business the necessary degree of skill and care. This obligation arises from the public nature of the employment, and is founded on the policy of the law for the protection of the persons and property of the public, which must of necessity be committed, to a very great extent, to the care of public carriers. *    *    *

It cannot be denied that pecuniary liability for negligence promotes care; and if public carriers in conducting their business can graduate their charges so as to discharge themselves from such liability, the direct effect will be to encourage negligence by diminishing the motives for diligence."

In *Davis v. Railway Co.,* 93 Wis., 470, 33 L. R. A., 654, 57 Am. St. Rep., 935, it was held: "A stipulation in a contract for the carriage of a passenger exempting the carrier from liability for injuries caused by its negligence or the negligence of its agents or employees is void as against public policy," the Court saying, on page 479: "It is very well established in this State that a contract for such an exemption from liability by a common carrier is void, as against public policy. The defendant could not, by any agreement, however plain and explicit, wholly relieve itself from liability for injuries caused by its negligence or the negligence of its agents or employees."

In *Railway Co. v. McGown,* 65 Texas, 640, it was held, quoting the headnotes, that: "A common carrier of passengers cannot by contract relieve itself from responsibility, or even limit its liability, for injuries to a passenger resulting from the negligence of itself or its employees, or agents, in the scope of their employment; and this is so with reference as well to passengers traveling free of charge as to those paying full fare. The liability of the carrier of passengers does not depend on the fact that compensation for the passenger has been paid to it, but the same degree of care is incumbent on the carrier in the case of a passenger traveling on a free pass as in the case of one paying full fare."

The Court says, on page 646: "The relation of passenger and carrier is created by contract, express or implied, but it does not follow from this that the extent of liability or responsibility of the carrier is, in any respect, dependent

McNEILL v. RAILROAD Co.

on a contract. In reference to matters indifferent to the public, parties may contract as they please; but not so in reference to matters in which the public has an interest. For the purpose of regulating such matters, rules have been established, by statute or the common law, whereby certain duties have been attached to given relations and employments. These duties attach as matter of law, and without regard to the will or wish of the party engaged in the employment, or of the person who transacts business with him in the course thereof; and this is so for the public good. Duties thus imposed are not the subject of contract. They exist without it, and cannot be dispensed with by it. The violation of such a duty is a tort. The law declares that it is the duty of a public carrier of passengers to use the highest degree of care to insure their safety. Why was not this left to be settled by the contract of the carrier and passenger? Certainly for no other reason than that the employment itself was of such a nature as to make it a matter of public concern. None could be of greater public concern, at the present day, than these employments by which men, women and children are transported by millions by agencies of a most dangerous character and with a speed heretofore unknown."

In *Railroad v. Crudup*, 63 Miss., 291, it was held that a mail agent traveling on a "free ticket" could recover, the Court saying, on page 302: "The Court properly excluded the evidence proposed by the defendant to show that the deceased had accepted a 'free ticket' by which he relieved the company from liability for the negligence of its servants. By their contract with the government the company received compensation for transporting both the mail and its custodians, and there would have been no consideration for the obligation entered into by the deceased to waive damages, and in addition to this it may be added that such a contract

M'NEILL *v.* RAILROAD CO.

is against public policy; the duty which common carriers owe to all persons carried by it, viz., not to be guilty of negligent injury, is one against the breach of which they may not protect themselves by private contract."

In *Railroad v. Hopkins,* 41 Ala., 486, 94 Am. Dec., 607, the Court says: "We do hold, however, that it makes no difference whether the service is performed gratuitously or not, in regard to the obligation to perform it well, after it is once entered upon; for ever since the decision of the leading case of *Coggs v. Bernard,* 2 Smith's Lead. Cas., 82, it has been regarded as sound law that 'the confidence induced by undertaking any service for another is a sufficient legal consideration to create a duty in the performance of it.' And we hold further, that in undertaking the performance of gratuitous transportation the common carrier can no more stipulate for exemption from liability for damage occasioned by the negligence, or willful default, or tort, of himself or his servants, than he can when he receives a reward for the service to be performed. Both are alike prohibited by a sound public policy, which also forbids a gratuitous bailee not bound by the considerations of public duty attached to the office of a common carrier from stipulating that he may be fraudulently negligent or safely dishonest. Railroad companies are incorporated in part, at least, from public considerations and for the public good. As carriers of persons and property it has been held they may be considered as acting in a public capacity and as a kind of public officers. The exercise of honesty, care and diligence by them or their agents and employees is a public duty resulting from their position, the obligation to perform which cannot be thrown off by contract. If thus thrown off the effect would be to relax or modify the performance of the duty and to promote a relaxation of proper care in the selection of agents and servants for its performance."

In *Waterbury v. Railroad,* 17 Fed. Rep., 671, it was held that: "The right which a passenger by railway has to be carried safely does not depend on his having made a contract, but the fact of his being there creates a duty on the part of the company to carry him safely. It suffices to enable him to maintain an action for negligence if he was being carried by the railroad company voluntarily, although gratuitously, and as a mere matter of favor to him."

*Wallace, C. J.,* says, on page 672: "A careful examination of the evidence shows quite satisfactorily that the case did not justify the assumption in any aspect of it that the plaintiff was entitled to be carried as a passenger as an implied condition of the contract to carry his cattle. The most that can be fairly claimed for the plaintiff upon the evidence is that he was riding upon the engine permissively. If he was riding there with the consent of the defendant, express or implied, it is not material, so far as it affects the defendant's liability for negligence, whether he was there as a matter of right or a matter of favor, as a passenger or a mere licensee. It suffices to enable him to maintain an action for negligence if he was being carried by the defendant voluntarily. If the defendant undertook to carry him, although gratuitously, and as a mere matter of favor to himself, it was obligated to exercise due care for his safety in performing the undertaking it had voluntarily assumed. *Railroad v. Derby,* 14 How., 468; *Steamboat v. King,* 16 How., 469. The carrier does not, by consenting to carry a person gratuitously, relieve himself of responsibility for negligence. When the assent to his riding free has been legally and properly given, the person carried is entitled to the same degree of care as if he paid his fare. *Todd v. Railroad,* 3 Allen, 18, 80 Am. Dec., 49. As is tersely stated by *Blackburn, J.,* in *Austin v. Railroad Co.,* 15 Weekly Rep., 863, 'the right which a passenger by railway has to be carried safely does

not depend on his having made a contract, but the fact of his being there creates a duty on the part of the company to carry him safely.' "

In *Railroad v. Derby,* 14 How., 468, it was held that a gratuitous passenger could recover, the Court saying, on page 484: "The liability of the defendants below for the negligent and injurious act of their servant is not necessarily founded on any contract or privity between the parties, nor affected by any relation, social or otherwise, which they bore to each other. It is true a traveler by stage coach or other public conveyance who is injured by the negligence of the driver has an action against the owner founded on his contract to carry him safely. But the maxim of *'respondeat superior,'* which, by legal imputation, makes the master liable for the acts of his servant, is wholly irrespective of any contract, express or implied, or any other relation between the injured party and the master. If one be lawfully on the street or highway, and another's servant carelessly drives a stage or carriage against him and injures his property or person, it is no answer to an action against the master for such injury, either that the plaintiff was riding for pleasure, or that he was a stockholder in the road, or that he had not paid his toll, or that he was the guest of the defendant, or riding in a carriage borrowed from him, or that the defendant was the friend, benefactor, or brother of the plaintiff. These arguments, arising from the social or domestic relations of life may, in some cases, successfully appeal to the feelings of the plaintiff, but will usually have little effect where the defendant is a corporation, which is itself incapable of such relations or the reciprocation of such feelings. In this view of the case, if the plaintiff was lawfully on the road at the time of the collision the Court were right in instructing the jury that none of the antecedent circumstances or accidents of his situation could affect his right to

recover." * * * "This duty does not result alone from the consideration paid for the service. It is imposed by the law, even where the service is gratuitous." "The confidence induced by undertaking any service for another, is a sufficient legal consideration to create a duty in the performance of it. (See *Coggs v. Bernard,* and cases cited in 1 Smith's Leading Cases, 95). It is true a distinction has been taken in some cases between simple negligence and great or gross negligence, and it is said that one who acts gratuitously is liable only for the latter. But this case does not call upon us to define the difference (if it be capable of definition), as the verdict has found this to be a case of gross negligence." "When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of the passengers should not be left to the sport of chance or the negligence of careless agents. Any negligence in such cases may well deserve the epithet of gross."

The citations of this celebrated case will be found in 5 Rose's Notes, pages 275, 284.

In *Steamboat v. King,* 16 How., 469, *Curtis, J.,* speaking for the Court, says, on page 474: "In *Railroad v. Derby,* 14 How., 486, which was a case of gratuitous carriage of a passenger on a railroad, this Court said: 'When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of passengers should not be left to the sport of chance or the negligence of careless agents. Any negligence, in such cases, may well deserve the epithet of gross.' We desire to be understood to

McNeill v. Railroad Co.

re-affirm that doctrine as resting not only on public policy but on sound principles of law."

In the celebrated case of *Railroad v. Lockwood*, 17 Wall., 357, than which there are few opinions more able or more widely cited and approved, it was held, quoting the language of the Court at the conclusion of its opinion on page 384, that:

"First. That a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.

"Secondly. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.

"Thirdly. That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter.

"Fourthly. That a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire. '

"These conclusions decide the present case, and require a judgment of affirmance. We purposely abstain from expressing any opinion as to what would have been the result of our judgment had we considered the plaintiff a free passenger instead of a passenger for hire."

The plaintiff was traveling on what was called a drover's pass, which expressly stipulated that the acceptance of the pass was to be considered a waiver of all claims for damages or injuries received on the train. The Court held that while the pass was professedly gratuitous on its face, it was in fact given as part of the original contract for shipping the cattle. The case is treated as a carriage for hire, but the reasoning of the opinion clearly applies to all classes of passengers. *Justice Bradley,* speaking for the Court, says, on

page 376 : "It is argued that a common carrier, by entering
into a special contract with a party for carrying his goods
or person on modified terms, drops his character and becomes
an ordinary bailee for hire, and, therefore, may make any
contract he pleases. That is, he may make any contract
whatever, because he is an ordinary bailee; and he is an ordi-
nary bailee because he has made the contract.

"We are unable to see the soundness of this reasoning. It
seems to us more accurate to say that common carriers are
such by virtue of their occupation, not by virtue of the
responsibilities under which they rest."

Again, the Court says, on page 377 : "In regulating the
public establishment of common carriers the great object
of the law was to secure the utmost care and diligence in the
performance of their important duties, an object essential
to the welfare of every civilized community. Hence the
common law rule which charged the common carrier as an
insurer. Why charge him as such? Plainly for the pur-
pose of raising the most stringent motive for the exercise of
carefulness and fidelity in his trust. In regard to passengers
the highest degree of carefulness and diligence is expressly
exacted. In the one case the securing of the most exact dili-
gence and fidelity underlies the law, and is the reason for it;
in the other it is directly and absolutely prescribed by law.
It is obvious, therefore, that if a carrier stipulate not to be
bound to the exercise of care and diligence, but to be at lib-
erty to indulge in the contrary, he seeks to put off the essen-
tial duties of his employment. And to assert that he may
do so seems almost a contradiction in terms."

And again, on page 381 : "Hence, the exemptions referred
to were deemed reasonable and proper to be allowed. But
the proposition to allow a public carrier to abandon alto-
gether his obligations to the public, and to stipulate for
exemptions that are unreasonable and improper, amounting

to an abdication of the essential duties of his employment, would never have been entertained by the sages of the law."

The extent to which this case has been cited and approved will be shown by reference to 8 Rose's Notes, page 48.

In *Railway Co. v. Stevens*, 95 U. S., 655, the Court says, on page 660: "Since, therefore, from our view of the case, it is not necessary to determine what would have been the rights of the parties if the plaintiff had been a free or gratuitous passenger, we rest our decision upon *Railroad Co. v. Lockwood, supra.* We have no doubt of the correctness of the conclusion reached in that case. We do not mean to imply, however, that we should have come to a different conclusion had the plaintiff been a free passenger instead of a passenger for hire. We are aware that respectable tribunals have asserted the right to stipulate for exemption in such a case, and it is often asked, with apparent confidence, 'May not men make their own contracts, or, in other words, may not a man do what he will with his own?' The question, at first sight, seems a simple one. But there is a question lying behind that: 'Can a man call that absolutely his own which he holds as a great public trust by the public grant and for the public use as well as his own profit?' The business of the common carrier, in this country at least, is emphatically a branch of the public service; and the conditions on which that public service shall be performed by private enterprise are not yet entirely settled."

In *Railroad v. Sullivan*, 120 Fed. Rep., 799, 61 L. R. A., 410, it was held that: "Riding in the coach set apart for colored passengers, contrary to the rules of the carrier and provisions of the statute, is not negligence on the part of a white person which will prevent a recovery for his death through the negligence of the carrier, although he would not have been injured had he not been in that coach."

In the earlier English reports the doctrine was uniformly

held that an action to recover damages for negligent injury by a common carrier arose from a breach of duty imposed by the common law and needed no contract to support it. In course of time, by some unexplained change of judicial sentiment, the courts began to recognize stipulations for release of liability, until finally common carriers were practically allowed to absolve themselves, by stipulation, from liability for all negligence, however gross. This led to the passage of the Act of 1854, called the "Railway and Canal Traffic Act," declaring that railway and canal companies should be liable for the negligence of themselves or their servants, notwithstanding any notice or condition, unless the judge or court trying the cause should adjudge the condition just and reasonable. The practical effect of this statute was to bring the law back to its original status. However, all the cases seem to hold that there is no implied release in the absence of written stipulations or fraudulent concealment of material facts. This is shown by the following cases, which are typical of others. In *Brotherton v. Wood,* 7 E. C. L., 345, the Court says, on page 348: "This action is on the case against a common carrier, upon whom a duty is imposed by the custom of the realm, or in other words, by the common law, to carry and convey their goods or passengers safely and securely, so that by their negligence or default no injury or damage happen. A breach of this duty is a breach of the law, and for this breach an action lies, founded on the common law, which action wants not the aid of a contract to support it."

In *Marshall v. Railway Co.,* 11 C. B. E. C. L., 73, *Jervis, C. J.,* says, on page 661: "But, upon what principle does the action lie at the suit of the servant for his personal suffering? Not by reason of any contract between him and the company, but by reason of a duty implied by law to carry him safely." In the same case *Williams, J.,* says, on page

135——45

663: "I am of the same opinion.   *   *   *   It seems to me that the whole current of authorities, beginning with *Govett v. Radnidge* and ending with *Pozzi v. Shipton,* establishes that an action of this sort is, in substance, not an action of contract, but an action of tort against the company as carriers.   That being so, the question is whether it was necessary to allege any contract at all in the declaration.   The earliest instance I find of an action of this sort is in Fitzherbert's Natura Brevium, 'Writ de Trespass sur le Case,' where it is said (9b): 'If a smith prick my horse with a nail, etc., I shall have my action upon the case against him without any warranty by the smith to do it well; for it is the duty of every artificer to exercise his art rightly and truly as he ought.'   There is no allusion there to any contract.   That being so, it seems to me to follow that the allegation of a contract in a case of this kind is altogether unnecessary."

In *Austin v. Railway Co.,* 2 Q. B., 442, it was held that a child over the free age prescribed by statute, and having no ticket, and no fare having been asked or paid, could recover for injuries received.   *Blackburn, J.,* concurring, says, on page 444: "I am also of opinion there should be no rule.   I think that what was said in the case of *Marshall v. Newcastle and Berwick Railway Co.* was quite correct.   It was there laid down that the right which a passenger by railway has to be carried safely does not depend on his having made a contract, but that the fact of his being a passenger casts a duty on the company to carry him safely."

A large number of authorities could be cited in addition to those above, but it is needless to do so.   We have already quoted at greater length than we should but for the fact that we wished to show, not simply the decision of the cases, but especially the essential principles by which those results were

reached.   We will now close by citations from the leading text-books.

In 5 A. & E. Ency., 507, it is said: "The carrier is liable to persons whom it accepts for transportation over its line, and from whom it demands no fare, to the same extent that it is liable to passengers who pay fare.   *   *   *   A person riding on a free pass is as much a passenger as if he were paying full fare, and if the pass is given for a valuable consideration he is a passenger for hire.   *   *   *   The fact that the carrier is prohibited by law from issuing free passes does not render a person a trespasser who travels upon such a pass unlawfully issued to him.   If the pass is unlawful, the conductor should demand the regular fare, and his failure to do so will not make the passenger a trespasser nor destroy his right as a passenger."

In 6 Cyc., 544, it is said that: "While it is no doubt true, as indicated in the definition, that public carriers of passengers are those who carry passengers for hire, there is not in the case of carriers of passengers a distinction as to liability between passengers carried for compensation and those carried gratuitously analogous to that recognized as to carriers of goods between cases where goods are carried for compensation and those where they are carried free.   One who is accepted for transportation as a passenger, without any compensation to be rendered, is nevertheless entitled to all the care and protection which the carrier is under obligation to furnish to paying passengers."

In Lawson on Contracts it is said, in section 335: "A carrier of a passenger who has paid a consideration for his passage cannot exempt himself from liability for damages caused by his own negligence or that of his servants, by any contract which he may have induced his customer to approve.   Such a contract is void as against the policy of the law, even though

the passenger is a gratuitous one, riding free and paying no fare."

In 2 Beach Mod. Law. of Contracts it is said, in section 1502: "The weight of authority in this country favors the rule that a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law; and that it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants."

In Fetter on Carriers of Passengers, section 220, it is said: "It is now well settled that a carrier, by its acceptance of a passenger as a passenger, comes under an obligation to take due and reasonable care for his safety, which obligation arises by implication of law, and independent of contract, so that it may exist though the contract of carriage is illegal, or though there is no express contract of carriage. Hence the fact that a contract of carriage is entered into on Sunday, and that plaintiff, when injured, was traveling on Sunday, in violation of a statute, does not preclude him from maintaining an action against the carrier for the injuries. In the language of the New York Court of Appeals, 'It is certainly a startling proposition that the thousands and tens of thousand of persons who travel on business or for pleasure on Sunday, upon railroads and steam and ferry boats in this State, are at the mercy of incompetent or careless engineers and servants, and that there is no remedy for loss of life or limb resulting from this negligence.' "

In Bishop on Non-Contract Law, section 1074, it is said: "Such, therefore, is both the policy of the law and the law itself, in the highest sense fundamental and unyielding. The result of which is that, in just legal reason, it will under no circumstances be competent for a railroad or other common carrier, whether of goods or passengers, to cast off this respon-

sibility by any resort to a by-law, to a usage, or even to an express contract with the party. Particularly in the carriage of passengers, if the road could by contract exempt itself from responsibility for its own negligence, its next step would be to refuse all passengers who would not enter into the contract; thereupon the railroad corporations, freed from the only motive to carefulness which they could appreciate, the danger of being mulcted in damages, would conduct their business with a recklessness rendering travel a horror to every person not permitted to remain at home." See also, section 1076.

In Cooley on Torts, on page 826 (685), it is said: "Carriers of passengers, it is also held, cannot relieve themselves from the obligation to observe ordinary care by any contract whatsoever, even in the case of 'drovers' passes,' which are given without charge to those who accompany consignments of cattle, or in cases where free passage is given as mere matter of courtesy or favor." The learned authority then proceeds to say that, while there are certain exceptions permitted in two States, "the weight of authority is most distinctly the other way, both in this country and in England"; that is, in favor of the rule as stated above.

In Hutchinson on Carriers it is said, in section 566: "It is enough that the person is being lawfully carried as a passenger to entitle him to all the care which the law requires of the passenger carrier; and the same vigilance and circumspection must be exercised to guard him against injury when he is carried gratuitously, as upon what is known as a free pass, or by the carrier's invitation, as when he pays the usual fare." See also, sections 565 and 567.

In Wharton's Law of Negligence it is said, in section 355: "Is a free passenger to be placed in a different position, so far as concerns his rights to protection from neglect, from a pay passenger? This question, also, was at one time

answered in the affirmative; the courts being led astray by the mistaken view of mandates which will be hereafter pointed out.    But there is now an almost uniform acquiescence in the true view that a person who undertakes to do a service for another is liable to such other person for want of due care and attention—*the diligentia of the bonus et diligens paterfamilias*—in the performance of the service, even though there is no consideration for such undertaking.   Or, as the question is elsewhere put, the confidence accepted is an adequate consideration to support the duty.   Eminently is this the case with what are called 'free' passengers on the great lines of common carriage.   As has already been observed, there is, in such cases, not merely confidence tendered and accepted, but *some sort of business consideration, though this be a mere courteous interchange of accommodations.*   For these and other reasons noted under the last head, the carrier is bound to exhibit the same diligence and skill towards passengers of this class as he is to passengers who pay money for their tickets."

Again the same author says, in section 354: "But if a trespasser take his seat openly in a carriage, in the place assigned to passengers generally, there is no reason why a different standard of care should be applicable to him than is applicable to other passengers.   Waiving for the present the point elsewhere discussed, that even a trespasser, supposing him to continue such, is not withdrawn from the protection of that law which requires that no man shall negligently injure another, the carrier, if he permits such trespasser to continue in the carriage, cannot regard him, after such permission, as a trespasser.   The carrier has a right to expel the trespasser at once from the carriage.   If the carrier omits to do this, and if the person in question remains voluntarily with the carrier's assent, then the trespass passes into a *quantum meruit* contract of carriage.   On the one side, the per-

McNeill *v.* Railroad Co.

son so entering the carriage is bound to the carrier for reasonable pay for the carriage. On the other side, the carrier is bound, from the time he assents thus to carry such person, to exercise towards him the diligence, prudence and skill of a good carrier in that particular kind of transport; in other words, the particular kind of diligence, prudence and skill which the carrier is bound to exercise towards all other passengers."

In Watson on Dam. for Personal Injuries it is said, in section 230, page 279: "At the outset it may be stated, as a general rule, that the mere fact that the plaintiff, at the time of the injuries received, is engaged in the commission of an unlawful act, is not sufficient to relieve the author of the wrong of liability in damages therefor. 'The question how far a person can defend an otherwise indefensible act,' it has been said, 'by showing a criminal or unlawful act on the part of the party injured, has of late years been fully discussed in the courts of this country and of England. The result generally reached is that no man can set up a public or private wrong committed by another as an excuse for a willful or unnecessary or even negligent injury to him or his property. This principle is defended on the grounds of morality and law, and it reaches and determines a great variety of cases.'" The same author further says, in section 238: "The liability of the owners of a steamboat for injuries to a passenger is not affected by the fact that the person injured was, at the time the injuries were received, engaged in an excursion with other passengers upon defendants' steamboat in violation of a statute prohibiting, is not, by reason thereof, without the protection of the law. The carrier owes him the same duty as if he were lawfully traveling, and is liable in damages for personal injuries resulting from a failure to perform it."

In section 231, the author adopts the language of an able and elaborate opinion by *Dixon, C. J.,* in *Sutton v. Wauwatosa,* 29 Wis., 27, 9 Am. Rep., 534, as follows: "Himself guilty of a wrong, not dependent on nor caused by that charged against the plaintiff, but arising from his own voluntary act or his neglect, the defendant cannot assume the championship of public rights, nor to prosecute the plaintiff as an offender against the laws of the State, and thus to impose upon him a penalty many times greater than what those laws prescribed. Neither justice nor sound morals require this, and it seems contrary to the dictates of both that such defense should not be allowed to prevail. It would extend the maxim, *ex turpi causa non oritur actio,* beyond the scope of its legitimate application, and violate the maxim equally binding and wholesome, and more extensive in its operation, that no man shall be permitted to take advantage of his own wrong. To take advantage of his own wrong and to visit unmerited and over-rigorous punishment upon the plaintiff, constitute the sole motive for such defense on the part of the person making it."

In 3 Thompson's Law of Neg., section 3326, it is said: "It is thoroughly settled in the American law that a common carrier of passengers cannot, by a contract with one who is a passenger for hire, relieve himself from liability for damages caused by the negligence of himself or his servants."

The same author says in section 3328: "The principle is well settled that a carrier owes the same duty of protection to a simply gratuitous passenger as to a passenger for hire."

In Buswell on Law of Pers. Injuries, the author, in laying down the rule that a breach of public duty is the foundation of the action for personal injuries, says in section 3: "The custom of the realm of England, long made a part of the common law, imposes upon common carriers of pas-

sengers certain public duties in respect of such passengers for a breach of which a passenger injured may have his remedy by an action of tort."

Again the author says, in section 116: "In the United States, the weight of authority is in favor of the rule that, as to passengers for hire, the stipulation by a common carrier that he will not be liable for damages in case of injury to the passenger, will not relieve him from responsibility for the results of the negligence of himself and his servants."

Again, the same author says, in section 117: "If a common carrier accepts a person as passenger, there being no contract to relieve the carrier from the legal consequences of his negligence in the case of accident, it is held generally, in the United States, that the carrier remains liable for such negligence, although the plaintiff was to be transported gratuitously. For, having admitted the plaintiff to the rights of a passenger, the defendant is not permitted to deny that he owes to him the duty which, as carrying on a public employment, he owes to all his passengers."

In 2 Parsons on Contracts, the author, after referring to various authorities, says, on page 222: "Whether a common carrier is liable to a passenger to whom he has given passage, and from whom he has, therefore, no right to demand fare, is not so certain; but he would certainly be liable for gross negligence, and probably liable for any negligence. He is certainly not excused by mere non-payment, unless payment has been demanded and refused. In note X it is said: "It is now quite generally held that for negligence there is the same liability to persons riding on free passes as to those who pay full fare."

In 2 Wood on Railroads, it is said, on page 1207: "In all cases where the company is required by law to carry a person free, or where he is riding free by the consent of the company fairly obtained, he is a passenger, and entitled to

all rights and privileges as such. In the case of a free pass,
the carrier is under the same obligations as to care and vigi-
lance as he is to a passenger for hire; and as to passengers
to whom passes are given which are predicated upon any con-
sideration, he cannot absolve himself from liability for inju-
ries resulting from gross negligence by any notice to that
effect printed upon the pass, as such conditions are against
the policy of the law. It has been held, however, that when
tickets or passes are purely gratuitous, the person receiving
may by special agreement assume all risks of the journey
incident to the mere negligence of the company."

In Whitaker's Smith on Negligence, while the text does
not seem to treat the subject, there are full notes on page
309 showing that the rule is that a common carrier "must
exercise the same care and attention in the transportation
of gratuitous passengers as of those who have paid their
fares, and is liable to the same extent for negligence." These
authorities tend to show that this rule is generally held even
in the face of express stipulations of exemption, and univer-
sally so in the absence of such stipulations.

In 4 Elliott on Railroads, it is said in section 1497:
"The rule supported by the weight of authority is that a
common carrier cannot by any kind of a contract exempt
itself from liability as such for loss or injury occasioned by
its own negligence or that of its servants. This rule 'rests
upon considerations of public policy and upon the fact that
to allow the carrier to absolve himself from the duty of
exercising care and fidelity is inconsistent with the very
nature of his undertaking.' The employment of a common
carrier is a public one, and the fundamental principle upon
which the law of a common carrier was established was
to secure the utmost care and diligence in the performance
of their duties. For this reason they are held to the extra-
ordinary liability of insurers. To permit them to contract

against liability for their own negligence or that of their servants would be contrary to the whole spirit and policy of the law governing common carriers, and would, in effect, authorize them to abandon the most essential duties of their employment. When we also consider that the parties do not stand upon an equal footing and that railroad companies are given many special privileges as corporations for the very reason that they have such duties to perform for the public, there can be no doubt of the justice of this rule, especially as applied to such corporations."

The same author says, in section 1578: "We think it is safe to say that the general rule is that every one on the passenger trains of a railroad company and there for the purpose of carriage with the consent, express or implied, of the company, is presumptively a passenger. * * * Persons who pay a consideration for passage, no matter in what form, are generally regarded as passengers."

And again, in section 1004, he says: "The general rule is that a person riding on a railway train on a free pass, the possession of which was lawfully and rightfully obtained, is a passenger. The possession of the pass must be lawful for if it was obtained by fraud or the wrong of the person attempting to use it, he is not a passenger, and the carrier owes him no duty as such." And again in section 1606, he says: "But where the person riding on a pass is regarded as a passenger the carrier usually owes to him the same degree of care that it owes to a passenger paying full fare." Again, he says in section 1608: "Passes usually contain a stipulation which in terms exempts the carrier from liability for negligence. As to the validity of such stipulations the authorities are not agreed, some holding that they are valid and binding upon the persons using the pass, others that they are not. In the majority of the States the courts hold that such a stipulation is void and not binding upon the per-

son using the pass, and that the carrier is liable for injuries negligently inflicted upon a person using a pass containing such a stipulation."

Again he says, in section 1609: "The relation which the person using the pass bears to the railroad company is also an important element in determining the liability. If he is regarded as a passenger, then the company is bound to use the highest practical degree of care, and, for a failure to use such care, it will be liable for all injuries approximately caused thereby. But where the person using the pass is an employee, then the carrier will only be liable for such injuries as result from negligence in failing to perform the duties owing to such employees." * * * "The general rule is that where the holder of the pass is to be regarded as a passenger any act of negligence may give a right of action."

We cannot better close these citations than by the following clear and terse statement of the principles from 2 Shearman & Redfield on Negligence, which is fully sustained by the authorities we have examined. The eminent authors say, in section 491: "It is well settled that, in the absence of a special contract, a passenger traveling gratuitously has a perfect right of action for injuries suffered by him through the carrier's negligence. The fact that a traveler who ought to pay has not paid, and does not intend to pay his fare, does not, in the absence of actual fraud, deprive him of redress for injuries. There is no practical difference between the degree of care which a free passenger has the right to claim, and that to which a paying passenger is entitled."

To our minds these authorities, taken in connection with the cases cited in them, are conclusive of the questions before us. The greater weight of authority is decidedly in favor of the doctrine that a common carrier cannot in any event stipulate against its own negligence, including that of its servants; while it is overwhelming to the effect that, in the

absence of such stipulations, it owes to a gratuitous passenger the same degree of care that it does to those that pay.   In the case at bar the plaintiff appears to have been a *bona fide* passenger, and was so recognized by the conductor in charge of the train.   Both are conclusively presumed to have known that the contract for a pass was illegal and void; but there is no evidence that either acted in fraud or bad faith.   There is evidence that the plaintiff gave some consideration, although legally inadequate; but in any event the worst position in which he can be placed is that of simply a gratuitous passenger.   There were no existing stipulations of exemption between him and the defendant.   None had ever existed except the conditions on the back of the pass.   These conditions can have no effect because, in the first place, the pass had expired; and, secondly, had no legal existence before its expiration.   A condition, like the leaf on a tree, must be attached to something from which it can draw its life and strength. By practically all the authorities, in the absence of such express conditions, the plaintiff is held entitled to recover. What would have been the legal effect of such conditions if they existed is not strictly before us.   We have shown that the decided weight of authority is against their validity, but we did so to show that if the liability of a common carrier to a gratuitous passenger could not be waived by an express stipulation, it certainly existed in the absence of any such stipulation.   Even those courts that hold it may be waived necessarily admit its existence in the absence of waiver.   If it exists in the absence of contract and cannot be waived by contract, it must necessarily owe its existence to the policy of the law.

It is contended in behalf of the defendant that there was error in the Court below refusing to charge: "That there is no evidence to support the plaintiff's allegation (in the complaint) that he was traveling on the defendant's road,

McNEILL v. RAILROAD CO.

on the occasion complained of, as a passenger for hire or compensation." We see no error in its refusal, as in our view of the case it was immaterial. The defendant also contends that its exception to the following charge of the Court should be sustained, to-wit: "If when the plaintiff was called on for his fare he produced to the conductor the pass which had been exhibited in evidence, and the conductor accepted it, the plaintiff was a passenger on the train."

We think that whatever error may be found in this instruction is harmless. The pass was in legal effect a blank piece of paper. It had expired by its own limitation, if that can be said to have expired which has never legally existed. Its only effect could have been to convince the conductor of the truthfulness of the plaintiff's statement that he had a contract with the company under which he was entitled to ride free. The result seems to have been his acceptance as a passenger by the conductor who, being in control of the train, is in the very nature of things the only officer or servant of the company who can accept a passenger. He is charged with that duty by the defendant, who must therefore abide the consequences of his act, especially as there is no evidence of fraud or deception on the part of the plaintiff. The evidence tends to prove that the plaintiff was on the train as a *bona fide* passenger under an agreement for so-called free transportation, but ready to pay his fare if demanded. The fact that the previous contract was illegal, and no fare was either demanded or paid, can have no further effect than to reduce the plaintiff to the condition of a merely gratuitous passenger, having no binding contract and therefore subject to no limitations of liability. As such we now think he was entitled to recover. The petition to rehear is allowed, and the judgment below affirmed.

Petition Allowed.

McNEILL v. RAILROAD CO.

CLARK, C. J., dissenting.   This is a petition to rehear this cause and reverse our opinion filed therein, 132 N. C., 510, 95 Am. St. Rep., 641.   That opinion is itself a precedent and to be set aside, like any other precedent, only upon good cause shown.   We have had the benefit of full and able argument upon both hearings, and diligent re-examination of the argument and the authorities shows that our former decision is in accord withour own precedents and those to be found elsefhere.

The complaint alleges that on April 6, 1900, "the plaintiff being a passenger on said defendant road" was injured by the derailment of the car in which he was riding, caused by the negligent construction of the road-bed and the negligent failure of the defendant to provide sufficient crew for said train, and its negligent failure to use such air-brakes and other machinery as were necessary to the safe and proper operation of said road.   There is no allegation of willful and wanton injury nor proof of such.   The complaint alleges that "the plaintiff was a passenger on said railroad for compensation,   *   *   *   the defendant having contracted and agreed to carry the plaintiff between said stations for a valuable consideration," and for a negligent breach of such contract of safe carriage this action is brought.

The plaintiff testified that he was editor of a newspaper; that when called on by the conductor for his fare he told him he had a pass for 1899 and showed it to him; that in 1899 he had made a contract with the defendant to publish its time-table in his paper as consideration for the pass, and the defendant had agreed to continue the contract and renew the contract; that he told the conductor he would pay the regular fare if he wanted it, but the conductor accepted his statement and took him as a passenger without payment of fare or ticket, on the strength of the alleged renewal by the company of the contract of 1899.   Such contract was illegal

and is forbidden under the authority of the law-making power in this State under a penalty of "not less than one thousand dollars nor more than five thousand dollars" against the company, and this not being a valid but an illegal transaction the plaintiff cannot be accessory to and participate in such act and then ask a court of justice to give him damages for the defendant's negligence in executing such illicit arrangement.

The General Assembly has declared that public policy forbids discrimination in the exercise of their quasi-public duties by common carriers, and as was said by us in this case, 132 N. C., at page 512, "nothing could be more clearly a discrimination than the ground upon which the plaintiff asked for and received free passage on this occasion, to-wit, that for the year previous he had advertised the schedule of the defendant company in his paper and had received therefor a free pass over its line for the previous year and that this contract had been renewed for the year current. It does not appear what was the value of the advertising done, charging for the space at the same rates as would be charged others; but let it be what it may, it could not amount exactly 'neither more nor less' to the value of a free pass to travel *ad libitum* an unstipulated number of miles over the defendant's road. Besides, it was an illegal discrimination to sell the plaintiff transportation on credit and not payable in money." We need not repeat the discussion and construction of this statute as laid down in the able and exhaustive opinion of *Mr. Justice Montgomery* in *State v. Railroad,* 122 N. C., 1052, 41 L. R. A., 246, and in the very able opinion of *Mr. Justice Douglas* in that case, in which he referred to evidence of $250,000 of free transportation being given away annually in this State, the cost of which was necessarily considered in fixing the rate charged the unprivileged many. That opinion and subsequent ones have been long

published, and the Legislature has not seen fit to change the statute by making editors "a privileged class" who can ride free or on credit, with rates unknown, and thus have the cost of their transportation added to the price of transportation charged the public at large. One ground for this legislation is that discrimination in rates gives these corporations improper weight and influence, and this applies with as much force at least to discriminations and favors to editors as to others. The Court in *Greenleaf v. Bank,* 133 N. C., 292, held that lawyers and judges were not a privileged class, and we cannot hold that editors are, unless the General Assembly shall give them special privileges as to free or reduced transportation which is forbidden to the public generally.

*Either* (1) the plaintiff, having produced no ticket nor paying cash for his transportation, was on the train without authority of any contract, in which case, by all the authorities, he was entitled to what is known as "ordinary care," and hence can recover no damages unless there was willful and wanton injury, which in this case is neither alleged nor shown (*Pierce v. Railroad,* 124 N. C., 83, 44 L. R. A., 316; *Cook v. Railroad,* 128 N. C., 333; *Lewis v. Railroad,* 132 N. C., 382; *Higley v. Gilmer* (Mont.), 35 Am. Rep., 450; *Hendryx v. Railroad,* 45 Kan., at page 379, and cases there cited; *Railroad v. Burnseed* (Miss.), 35 Am. St. Rep., 656; *Railroad v. Mehlsack* (Ill.), 19 Am. St. Rep., 17; *Reary v. Railroad* (La.), 8 Am. St. Rep., 497; *Railroad v. Mecham,* 91 Tenn., 428; *Whitehead v. Railroad,* 99 Mo., 263, 6 L. R. A., 409), for neither the conductor nor the company could give legal assent to his riding contrary to law without payment of fare and his condition was that of a trespasser, not being a passenger.

*Or* (2) the plaintiff, as he alleges in his complaint, sues for injuries sustained by breach of the contract of safe car-

135——46

riage caused by negligence of the defendant, and one of
his prayers for instruction is based upon the theory that
the plaintiff was a passenger for hire and compensation. In
such case the rule is thus stated, 1 Sutherland Damages, sec-
tion 5 (3 Ed.) : "It may be assumed as an undisputed prin-
ciple that no action will lie to recover a demand *or a sup-
posed claim for damages* if to establish it the plaintiff
requires aid from an illegal transaction, or is under the neces-
sity of showing and depending in any degree upon an illegal
agreement to which he was a party"—citing numerous cases.
*Judge Sutherland* further says that "a bank is not liable for
failure to perform its contract to lend or advance money to be
used in speculating in futures (*Moss v. Bank,* 102 Ga., 808).
The sender of a telegram relating to a gambling contract in
stocks cannot invoke such contract or the loss or gain result-
ing from it to measure the damages sustained in consequence
of its non-delivery (*Morris v. Telegraph Co.,* 94 Me., 423)."
In *Griswold v. Waddington,* 16 Johns, 439, *Chancellor Wal-
worth* says, at page 486 : "The plaintiff must recover upon
his own merit, and if he has none, or if he discloses the case
founded upon illegal dealing and founded on an intercourse
prohibited by law he ought not to be heard, whatever the de-
merits of the defendant may be. There is to my mind some-
thing monstrous in the proposition that a court of law ought
to carry into effect a contract founded on a breach of law. It
is encouraging disobedience and giving to disloyalty its unhal-
lowed fruits. There is no such mischievous doctrine to be
deduced from the books." In *Bowman v. Phillips* (Kan-
sas), 13 Am. St. Rep., 202, 3 L. R. A., 631, it is held:
"The courts will not enforce illegal contracts nor any sup-
posed rights founded thereon, but will leave the parties and
those *in pari delicto* where they find them." In *Oscanyan
v. Arms Company,* 103 U. S., 261, an action for damages
for breach of contract, the Court held that when such con-

tract is void, because against public policy or in viola-
tion of law, the Court will nonsuit the plaintiff. In
*Phalen v. Clark* (Conn.), 10 Am. Rep., 253, the Court held:
"Where the plaintiff requires any aid from an illegal trans-
action to establish his demand he must fail."

In *Welch v. Aesson,* 6 Gray, 505, it is said: "It may be
assumed as an undisputed doctrine that no action will lie to
recover a claim for damages if, to establish it, the plaintiff
requires aid from an illegal transaction or is under the neces-
sity of showing or in any manner depending upon the illegal
act to which he is a party." In *Pullman v. Transportation
Co.,* 171 U. S., at page 150, *Mr. Justice Beckham* quotes
with approval from *Lord Mansfield* in *Holman v. Johnson,*
1 Cowper, 341, decided in 1775: "The objection that a con-
tract is immoral or illegal  *  *  *  sounds at all times
very ill in the mouth of the defendant. It is not for his
sake, however, that the objection is ever allowed, but it is
founded on general principles of public policy.  *  *  *
The principle of public policy is this: *Ex dolo malo non
oritur actio.* No court will lend its aid to a man who founds
his cause of action upon an immoral or an illegal act." It
can make no difference whether the action is to recover upon
such contract to enforce specific performance or (as here)
to recover damages for breach thereof. The precise point
here presented has been three times passed upon in this Court,
not only in the case here sought to be reversed, 132 N. C.,
510, but in two other cases. In *Smith v. Turner,* 63 N. C.,
522, it was held that where a soldier *contracted* with a rail-
road for transportation to Johnston's army and was injured
*en route* by negligence of the company he could not recover
damages (though there the contract was legal when made),
*Reade, J.,* saying that the contract being illegal (in the pur-
view of the Court trying the action) the parties were *in pari
delicto,*" and the Court "would consult its dignity and not

interfere in their dispute." Exactly the same decision was made in *Wallace v. Cannon,* 38 Ga., 199, 95 Am. Dec., 385; *Martin v. Wallace,* 40 Ga., 52; *Redd v. Railroad,* 48 Ga., 102; *Railroad v. Redd,* 54 Ga., 33; in all which the Court held, as in 40 Ga., 55: "While so engaged the parties were *in pari delicto* and the courts * * * cannot lend their aid to assist either in the case of injury sustained by the negligence or misconduct of the other." Another case in this State is *Waters v. Railroad,* 110 N. C., 338, 16 L. R. A., 834, where the Court held (at page 342) that where the illegal purpose of the shipper or passenger enters into the consideration of the contract of transportation the railroad is exempt from liability for negligence, meaning evidently that the Court will not take jurisdiction of such controversies. Here both parties participated in the illegal purpose of transporting the plaintiff, contrary to law, without payment of fare, and as in the above cases "while so engaged the parties were *in pari delicto* and the courts cannot lend their aid to assist either in the case of injury sustained by the negligence or misconduct of the other."

It is immaterial whether the plaintiff had in his pocket a free pass from the president of the railroad company or was allowed by the conductor to ride illegally, without payment of fare, in consideration of the plaintiff's statement that the company had promised to renew the pass. The conductor, no more than the president, could give the plaintiff the legal right to ride free, unless the plaintiff came within one of the excepted classes entitled to that privilege, as railroad employees and officials, charity cases and the like. It was an illegal contract equally whether made by the conductor or the president. Whether the conductor had the legal right to bind the company by his action so as to subject it to the penalty denounced by the statute is not before us. But if he had not, then the plaintiff had no claim to a contract of passage

on that ground, and comes under the first head above, not being a passenger, and could only recover for willful and wanton injury.

The point here presented is well settled in the text-books and by decisions in other States, that the plaintiff cannot recover when he is negligently injured while on the train without any valid contract of carriage, *i. e.,* when he is a licensee or trespasser. In such cases he can only recover if wantonly and willfully injured, or, as it is sometimes styled, for gross negligence, which is the synonym for "willful and wanton injury" in those cases. Black Law Dict., "Passenger," says that a passenger is "One who has taken his place in a public conveyance *by virtue of a contract* for the purpose of being transported from one place to another on the payment of fare or its equivalent, *Bricker v. Railroad,* 132 Pa., 1, 19 Am. St. Rep., 585; and a carrier is not liable to one who rides by stealth, *Railroad v. Michie,* 83 Ill., 427; or who is a trespasser, *Meahlhauser v. Railroad,* 91 Mo., 322; although invited to ride by an employee of the carrier, *Railroad v. Campbell,* 76 Texas, 174; nor a voluntary assistant to an express messenger or mail clerk, *Railroad v. Nichols* (Kan), 12 Am. Rep., 475; or a newsboy permitted to ride free, *Flower v. Railroad,* 69 Pa., 210, 8 Am. Rep., 257; *Snyder v. Railroad,* 60 Mo., 413." Certainly the plaintiff, who was on this train by an arrangement denounced by the statute under a penalty of "not less than $1,000 nor more than $5,000 fine," is not in so good a situation as those above named as barred of recovery.

Hutchison on Carriers, section 555, says: "To be entitled to the right of a passenger, the plaintiff who sues for an injury occasioned by the negligence of the company must have been lawfully upon its train," and that if sued for the injury it can defend upon the ground that the plaintiff had induced the servants of the company to carry him upon a ticket on

which he had no right to ride. 2 Minor's Wood Railways (2 Ed.), 1213, instances among persons not entitled to recover for negligent injuries one 'who, contrary to the rules, gets on a freight train, even with the assent of the conductor, and pays no fare, or a trespasser upon a regular passenger train." If the assent of the conductor does not make him a passenger when riding contrary to the rules of the company, such assent cannot set aside a statute forbidding the plaintiff to ride without paying fare. 3 Elliott Railroads, section 1255, says: "A railroad company owes trespassers no contract duty. Indeed, it owes them no duty except not to willfully injure them." 1 Fetter Passengers, section 240, uses almost the same language: "The only duty due by a railroad company to one who is an intruder or trespasser on its trains is to refrain from wantonly, willfully or intentionally injuring him. It is not liable for an injury caused by the mistake, inadvertence or negligence of its employees." 2 Shear. & Red. Neg., section 489, holds that "one who by collusion with a servant of the carrier rides without intending to pay fare * * * does not bring him into contract relation with the company so as to make it liable to him as a passenger." To the same purport, Thomp. Carriers, 43. Booth Street Railways, section 326, says: "The duty of a common carrier does not extend to the personal safety of one who is not actually a passenger," and the same work at section 365: "Newsboys who enter street cars for the purpose of selling papers are not passengers, but mere licensees who assume all the risks of ordinary negligence on the part of the company's servants." Certainly the newsboys who are legally on the car, with the assent of the company, cannot have greater rights than this plaintiff, who was riding without payment of fare in violation of law. Bishop Non-Contract Law, section 60, says: "If the negligent running of a railroad train injures one who is on it without right he can recover nothing." 2

Jaggard Torts, 1081, says: "When no consideration is paid, though the plaintiff was aboard the train by the invitation or request of defendant's employees, he cannot recover for negligence," citing numerous cases.

All the above are based upon the idea that no one can recover for negligent injuries unless a passenger, and that no one is a passenger unless there is a legal contract, express or implied, a legal obligation to convey him. The above citations from text-books are amply sustained by authorities, among which: "A railroad company owes no duty to a trespasser on its trains except to abstain from wantonly or maliciously injuring him." *Railroad v. Harris,* 71 Miss., 74. "One who is allowed by the conductor to ride as an assistant express messenger without paying fare, under a misapprehension of the conductor that he need not pay, cannot recover damages for injuries sustained by negligence of the carrier." *Railroad v. Nichols,* 8 Kansas, 505. In the very interesting opinion by *Judge Valentine,* he says: "The conductor did not attempt to confer upon the plaintiff any right to ride upon that train, but simply left the plaintiff with the right which he supposed the plaintiff already had, independent of any authority from himself"—the same facts as in this case, though under our statute the conductor could confer no right to ride free when the company itself was prohibited by statute from doing so. In *Railroad v. Meachem,* 91 Tenn., 428, it is held that the company is not liable for injuries sustained by a trespasser or intruder upon its trains "except to refrain from wilfully, wantonly or intentionally injuring him," and defines a trespasser as one who rides without payment of fare or authorized invitation. In *Railroad v. Beggs,* 85 Ill., 84, 28 Am. Rep., 613, the same ruling as to non-liability was made as to one riding illegally upon a free pass which had been issued to another person, and this has been cited and affirmed in *Railroad v. Mehlsack,* 131 Ill., 61.

The pass there used was not more illegal than the pass which the plaintiff in this case presented. *Eaton v. Railroad*, 57 N. Y., 382, 15 Am. Rep., 513, held that one not lawfully upon the train, as one riding upon a freight train, could not recover for negligent injuries though upon the train by the invitation of the conductor. In *Railroad v. Campbell*, 76 Texas, 174, it was held that one injured negligently while riding on a freight train could not recover because unlawfuly there; and the same ruling was made, and on the same ground, as to one injured while riding upon the engine by permission of the engineer. *Railroad v. Michie*, 83 Ill., 427. The plaintiff in the present case was not lawfully upon the train, it being forbidden by law to carry him without prepayment of fare, and neither the conductor nor the company had authority to receive him on the train without it. In *Condran v. Railroad*, 67 Fed. Rep., 522, 28 L. R. A., 749, it is held that one who wrongfully evades payment of fare cannot recover for injuries unless wantonly and willfully inflicted.

In *Railroad v. Berry*, 53 Kan., 112 (42 Am. St. Rep., 278), it is held that one riding upon a railroad train merely by permission of the conductor and without payment of fare cannot recover for personal injuries like a passenger; affirming *Railroad v. Wheeler*, 35 Kan., 185. In *McVeety v. Railroad* (Minn.), 11 L. R. A., 174, 22 Am. St. Rep., 728, it is held that one "who knowingly induces the conductor of a railway company to · carry him without charge" cannot recover as a passenger. In *Williams v. Railroad*, 19 So. Rep., 90 (Miss., 1895), it was held that one illegally riding free by consent of the conductor could not recover, and the same was held in *Railroad v. McAfee*, 71 Miss., 70 (1893), as to one riding free by collusion with the railroad crew and was beaten by them; the latter case is put on the ground of

*in pari delicto* that he had "participated in the violation of duty."

One riding on a train illegally, for instance, contrary to a rule of the company known to him though with permission of the conductor, cannot recover for injuries sustained by negligence. *Purple v. Railroad,* 114 Fed. Rep., 123, 57 L. R. A., 700; *Railroad v. Campbell,* 76 Texas, 174; *Greenfield v. Railroad* (Mich.), 95 N. W., 546 (March, 1903). "The only duty a common carrier owes to one not a passenger is not to injure him wantonly." *Hendryx v. Railroad,* 25 Pac., 893. "One riding on a railway train free of charge by invitation and permission of the conductor is not a passenger so as to entitle him to recover for injuries received." *Stallcup v. Railroad,* 16 Ind. App., 584 (1897) ; and there are numerous other decisions to the same effect.

*The bed-rock principle deduced from all the decisions and text writers is that an action for injuries for negligence of a common carrier is an action of tort arising on contract and can never be sustained except when there is a breach of a legal and valid contract of safe carriage, that as to torts not arising out of contract recovery can only be had when the injury was inflicted wantonly and willfully.*

This is sound in principle and well settled, if any principle can be settled by precedent.

Taking it in the most favorable light for the plaintiff, he was riding on an extension of an illegal pass. That being so, upon the authorities in our State and those from other States and text writers above cited, the plaintiff cannot recover damages sustained by the negligent breach of such illegal contract of carriage. There are other authorities to the same purport. In Massachusetts, where traveling on the Lord's Day except from necessity, or for purposes of charity, was made illegal, it was held in an opinion by that eminent lawyer, *Shaw, C. J.,* in *Bosworth v. Swansey,* 10

Metc., 363, 43 Am. Dec., 441, that one so traveling illegally could not recover damages caused by a defect in the highway, and to the same purport is *Conolly v. Boston,* 117 Mass., 64, 19 Am. Rep., 316, and *Davis v. Somerville,* 128 Mass., 594, 35 Am. Rep., 399 (1880). The same was held as to recovery of damages sustained by negligence of a street car company by one traveling thereon on Sunday (*Stanton v. Railroad,* 14 Allen, 485); and as to one negligently injured at a railroad crossing while illegally traveling along the public road on Sunday. *Smith v. Railroad,* 120 Mass., 492, 21 Am. Rep., 538. In *Gregg v. Wyman,* 58 Mass., 322, it was held that the owner of a horse who let him for driving on Sunday, against the statute, could not recover damages for the death of the horse by immoderate driving, because the parties were *in pari delicto,* the Court saying its conclusion "is fully sustained by numerous decisions both in England and the various States of the Union," many of which it cites, and the same is held in *Way v. Foster,* 83 Mass., 408, and *Parker v. Latner,* 60 Me., 529, 11 Am. Rep., 210. In *Lyons v. Desotelle,* 124 Mass., 387, it was held that one traveling on the Lord's Day in violation of the statute, and who had fastened his horse at the side of the road, could not invoke the aid of the courts to recover damages for injuries to his horse caused by the negligent act of another in driving against it. In *McGrath v. Merwin,* 112 Mass., 467, 17 Am. Rep., 119, it was held that one injured by the negligence of the defendant while clearing out a wheel-pit, though gratuitously and as an act of kindness, on the Lord's Day, could not recover damages, because participating at the time the injury was sustained in an act in violation of law. In *Wallace v. Navigation Co.,* 134 Mass., 95, 45 Am. Rep., 301, it was held that one sailing his yacht on Sunday in violation of the statute could not recover damages for being negligently run into by a steamboat, because he was there in vio-

lation of law, as the plaintiff was in this case. These decisions were uniform in that State till changed by statute as to injuries from common carriers (Laws 1877, chapter 232), which provides that the general statute, chapter 84, section 2, "prohibiting travel on the Lord's Day shall not constitute a defense to an action against a common carrier of passengers for any tort suffered by a person so traveling." There is no statute in North Carolina taking away from common carriers the defense of *in pari delicto* in case of one traveling on a free pass. The defendant relied on *Carroll v. Railroad,* 58 N. Y., 126, 17 Am. Rep., 221, where it was held that the plaintiff, injured on a ferry boat while traveling on Sunday contrary to the statute, could recover, but the Court put its decision on the ground (page 132) that if the plaintiff was going in a case of necessity or charity he was not traveling illegally, and as the defendant had the right to carry him and to enforce payment of the fare, if the illegal purpose of the plaintiff was unknown to the defendant, the latter made a valid contract of carriage and was liable for negligence in executing it. Here the plaintiff solicited the illegal carriage by saying his pass had been renewed, and the conductor acted upon it. Both parties knew of the illegality.

In *Smith v. Rollins,* 11 R. I., 464, 23 Am. Rep., 509, where a livery-stable keeper let his horse for driving on Sunday contrary to the statute, and the other party drove to a different place and brought the horse back damaged, it was held that the plaintiff could not recover, the Court saying (page 472): "If the tort cannot be made to appear without proof of the contract, certainly the contract can hardly be considered immaterial, or as not affecting the liability of the defendant, even though it may not be a part of the cause of action." In *Holcombe v. Damby,* 51 Vt., 428, the Court says (page 435), affirming previous cases: "It has been repeatedly held in this State that if a party sustain injury

by reason of the insufficiency in the highway while such party is traveling in violation of the statute, he cannot recover of the town for such injury." In *Lord v. Chadbourne*, 42 Me., 429, 66 Am. Dec., 290, it was held that the plaintiff could not recover damages for the alleged seizure of his whiskey if he was keeping it for sale in violation of law.

Among many cases holding that a party participating in an illegal act cannot obtain from the Court relief for an illegal act or neglect of the other party, if such conduct of the defendant cannot be shown without showing the precedent conduct of the plaintiff, in violation of law, are *Light Co. v. Veal*, 145 Ind., 506, which held that a county treasurer loaning out county funds contrary to law cannot maintain an action to recover them back. *Haggerty v. Ice Co.,* 143 Mo., 238, 65 Am. St. Rep., 647, 40 L. R. A., 157, holds that where it is contrary to law to have game in possession during the "close season," one who has deposited game in violation of the statute with a cold storage company "cannot recover damages for violation of the contract or for negligence in its performance," the Court saying the complaint shows "that the plaintiff contracted with the defendant corporation for the commission of a misdemeanor.    *    *    * The law will not stultify itself by promoting on the one hand what it prohibits on the other, and will for this reason leave the parties to the suit where it finds them, unsanctioned by its favor and unaided by its process." That case is identical in principle with this, the plaintiff having committed no misdemeanor but having procured the defendant to contract to do an indictable act, as in this case.

Upon similar grounds, in *Ketchum v. Greenbaum,* 61 Mo., 110, it was held that the plaintiff could not recover a prize drawn on a lottery ticket, upholding the maxim *in pari delicto polior est conditio defendentis et possidentis*—not that the defendant has right on his side but because the Court

will help neither party to an illegal transaction. In *Young-blood v. Trust Co.,* 95 Ala., 521, 36 Am. St. Rep., 245, 20 L. R. A., 58, it was held: "No rights can spring from or be rested upon an act in the performance of which a criminal penalty is incurred, and all contracts which are made in violation of a penal statute are absolutely void." In *Brewing Co. v. Wall,* 98 Mich., 158, it was held that a liquor dealer doing business in violation of the statute could not recover damages for violation of a contract by a company to make him its exclusive agent in that locality. The plea that he could legally buy, though he could not legally sell, was overruled on the ground that he was buying to illegally sell. In *Kelly v. Courter,* 1 Okla., 277, it was held that a tenant selling liquor in violation of law could not recover damages to such liquor caused by the failure of the landlord to supply ice as agreed, the Court resting its decision upon a citation from *Ewell v. Daggs,* 108 U. S., 146, that the law will not lend its aid where the contract "appears to have been entered into by both the contracting parties for the express purpose of carrying into effect that which is prohibited by the law of the land, Broom's Leg. Max., 108"—which was the case in this transaction now before the Court. The Oklahoma Court neatly sums up thus: *"The principle to be extracted from all the cases is that the law will not lend its support to a claim founded upon its violation."* Many cases to like purport could be added, but it is useless to multiply authorities upon a principle so well settled in the law and in reason.

The same general principle that no action can be sustained if based in anywise upon an illegal contract which must be put in evidence—*ex turpi causa actio non oritur*—is supported by all the precedents in this Court in which a contract was necessarily alleged as in this case. *Basket v. Moss,* 115 N. C., 448, 44 Am. St. Rep., 463; 48 L. R. A., 842; *Burbage v. Windley,* 108 N. C., 357, 12 L. R. A., 409;

*Pucket v. Alexander,* 102 N. C., 95, 3 L. R. A., 43; *Griffin v. Hasty,* 94 N. C., 438; *Covington v. Threadgill,* 88 N. C., 186; *King v. Winants,* 71 N. C., 469, 17 Am. Rep., 11; *Whitaker v. Bond,* 63 N. C., 290; *Carter v. Greenwood,* 58 N. C., 410; *McRae, v. Railroad,* 58 N. C., 395; *Ingram v. Ingram,* 49 N. C., 188; *Ramsay v. Woodard,* 48 N. C., 508; *Allison v. Norwood,* 44 N. C., 414; *Sharp v. Farmer,* 20 N. C., 122, and "there are others." The plaintiff cannot recover for negligence without showing he was on the train under a valid contract of carriage, and the contract he shows is one against public policy and makes at least one of the parties indictable. Whether the other party is not also indictable as an accessory in procuring such violation of law is an interesting question, but not now before us.

The plaintiff's allegation is that he was on the train by virtue of his contract for a free pass. Such transaction being a discrimination, as above shown, the penalty denounced by the statute upon the common carrier for such violation of law is a fine "not less than one thousand dollars nor more than five thousand dollars," and the penalty of the law upon the other party is that, if negligently injured during such illegal transportation, he cannot recover in the courts, since he must put forward such illegal transaction as the basis of his action. If his own act was not indictable, he procured an act by the defendant which was a misdemeanor and obtained transportation thereby.

A court of equity will not interfere with a contract, if it be illegal and against State policy, where the contractors are *in pari delicto.* *Taylor v. McMillan,* 123 N. C., 393, citing *Grimes v. Hoyt,* 55 N. C., 271. If there was no contract of carriage the plaintiff had no rights as a passenger, but only the right to be protected against willful and wanton injury, which is not alleged here. If he had any contract, it was

one void under our decisions, being forbidden by statute and against public policy, and he is in no better condition.

The decisions in some courts as to persons injured while riding upon *legal* free passes are not authority in favor of plaintiff, who asked and accepted free transportation *illegally*. The conductor had no right to receive him as a passenger, and plaintiff was fixed with knowledge of the law, and is in no condition to ask the Court for damages not inflicted willfully and wantonly.

The former judgment of this Court ordering a new trial should be affirmed and the petition to rehear dismissed upon at least two other grounds not heretofore discussed, because not deemed necessary.

Jones, a witness for the defendant, testified that he sent the plaintiff the pass as a gratuity, upon his application; that he paid nothing for it; that there was no contract to publish the time-table, and that he made no agreement to renew the pass when it expired. The defendant asked the Court to charge "that there is no evidence to support the plaintiff's allegation (in the complaint) that he was traveling on the defendant's road, on the occasion complained of, as a passenger for hire or compensation." It was error to refuse this, for whether the plaintiff's or the defendant's testimony was correct, whether the pass had been renewed or not, the plaintiff was not a "passenger for hire or compensation." *State v. Railroad Co.*, 122 N. C., 1052, 41 L. R. A., 246.

The defendant also excepted properly to this charge of the Court: "If when the plaintiff was called on for his fare he produced to the conductor the pass which has been exhibited in evidence and the conductor accepted it, the plaintiff was a passenger on the train." The pass on its face had expired and there was no testimony that it had been renewed. The Judge does not add the proviso "if·it had been renewed," and if it had not been, certainly it could not make him a

passenger. On the contrary, if the plaintiff's own evidence was true that a pass was issued in consideration of publishing the time-table, and further that the defendant had agreed to renew it, this being an agreement to make a contract forbidden by our statute against discrimination, the plaintiff was equally not a passenger. In any aspect this instruction was erroneous.

The point here presented has been admirably discussed by *Sanborn, U. S. Circuit Judge,* in the recent case, above cited, of *Purple v. Railroad,* 114 Fed., 123; 57 L. R. A., 700, which holds: "One who, knowing that a conductor has no authority to grant free transportation, rides upon a train under an arrangement, or tacit understanding, with the conductor that he shall ride free, is not a passenger, but a mere trespasser to whom the only duty of the company is to abstain from willful or reckless injury; that a contract of carriage is indispensable to a recovery and that the implied contract from plaintiff being on the train was conclusively negatived upon showing the illegal agreement to transport without payment of fare." To same purport *Condran v. Railroad,* 28 L. R. A., 749; *Railroad v. Mehlsack,* 131 Ill., 64; *Railroad v. Beggs,* 85 Ill., 84; *Railroad v. Michie,* 83 Ill., 431; *Railroad v. Brooks,* 81 Ill., 250; *McVeety v. Railroad,* 45 Minn., 269, 11 L. R. A., 174; *Robertson v. Railroad,* 22 Barb., 91; *Railroad v. Campbell,* 76 Tex., 175; *Prince v. Railroad,* 64 Tex., 146; *Way v. Railroad,* 64 Iowa, 48; S. C., 73 Iowa, 463; *Hendryx v. Railroad,* 45 Kans., 377; *Railroad v. Whipple,* 39 Kans., 531; *Railroad v. Gantz,* 38 Kans., 608; *Railroad v. Nichols,* 8 Kans., 505, 12 Am. Rep., 475.

Here the plaintiff was fixed with notice in law that neither the company nor the conductor could transport him without payment of fare. In *McGraw v. Railroad,* 135 N. C., 264, at this term, it was held that though one had a ticket he cannot recover for willful expulsion if the conductor erro-

McNeill *v.* Railroad Co.

neously but reasonably supposed he had no ticket. *A fortiori,* the plaintiff cannot recover when he had no ticket, which the conductor knew, and there was no force used, but merely negligence is averred. In *Duncan v. Railroad,* 113 Fed., 508 (1902), the Court says, on this very point, of the plaintiff being injured while riding on a pass illegally contrary to the interstate commerce prohibition (of which ours is a verbation copy), "Of course if the foundation of the right against a common carrier were contract, it would be apparent that, under familiar maxims of the law, no action would lie, because even though the plaintiff is not subject to any penalty imposed by the interstate commerce statute, he would be *in pari delicto.* Indeed, he would be the party especially enjoying the benefit of the combination in violation of law." Here the complaint bases the action, and necessarily so, upon breach of the contract of safe carriage.

MONTGOMERY, J.     I concur in the dissenting opinion of the Chief Justice.